MAGISTRATE JUDGE Boal

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
_____X

WAYNE THOMPSON, Petitioner,

    -against-

WORCESTER COUNTY. D A J D. EARLY JR .
SHERIFF GOULDS, SUPT HALL. C.O. JOHN
DOE, CLASS. DIRECTOR. MICHAEL LANDGREN.
MED. PROVIDER. et al. ect.
_____X

**COMPLAINT**

PURSUANT TO 42 USC § 1983,
1915and 1997e, CONST. AMEND
2nd, 8th, and 14th

case # _____

**JURY TRIAL REQUESTED**

# 10 CA 40126-FDS

    This complaint is being brought pursuant to 42 U S C § 1983, the Patient Bill of Rights and Public Health Laws, [Fed.R Civ. P. 23(b)(2)], The Civil Rights of Institutionalized Persons Act 7(a), and seeks monitary damages due to unsafe jail conditions. Venue properly lies within this U.S. District Court, under 28 U.S.C. 1391(b)(2), as the events giving rise to the claim took place in Worcester County, Ma.

    Plaintiff alleges that he was an (IAD) prisoner from the state of New York. after being denied his constitutional right to Due Process of the Law to fully exercize his right to challenge the extradition. That he was held at the Worcester County Sheriff's Office for (42) days, from March 15th. 2010. to April 26th. 2010, under conditions known to his jailers as dangerous for Black and out-of-state prisoners, particularly those from New York. He charges that there existed an environment of hostility towards Black and out-of-state prisoners by the overwhelming majority of Spanish prisoners. many of them gang members who regularly attack other prisoners and exhibit a level of control over the housing unit, sanctioned by security.

    Petitioner states that the state of Massachusetts, under the (IAD) Interstate Agreement on Detainers had a heightened level of responsibility to protect and keep him safe from serious injury or harm, but that in this instance they failed to meet that responsibility. Upon arrival to the facility Petitioner was immediately placed into the general population C-Max housing unit where he observed spanish gang members providing commissary donations to security correctional officers on commissary night. One or two officers would make a round of the unit after delivering inmate commissary with a large black garbage bag shouting "DONATIONS". Those donations

would provide for protection and allow the gangs to maintain a position above other prisoners housed on the unit. If security or the gang wanted someone removed from the unit, a fight would be staged, both prisoners would be taken to lock-up, the gang member returned to the unit within (15) days and the other prisoner sent to long-term keeplock.

Pursuant to the (W.C.S O.) housing rules and regulations, the C-Max housing unit is a designated housing unit strictly designated for housing "DETAINEES" who have not yet been sentenced by the court. On April 21st. 2010, at approximately 11:10/pm, these same spanish gang members began a barrage of verbal assaults upon the assigned correctional officer for the 11-7 shift, a practice they performed nightly as a ritual. Most officers were acustomed to the harrassment and some even engaged in return with retorical responses. However; this particular officer took extreme offense to the name calling and the next morning he sort to issue (4) disciplinary reports to include the Petitioner, who took no part in the verbal attacks. Petitioner, upon seeing his name and cell location posted on the chalk board, made an attempt to speak to the officer to which the officer replied, he did not care and what is done is done. Petitioner was scheduled to attend court that morning and was representing himself as a Pro Se defendant, and the wrongfull accusation upset him. He had to attend the infirmary to take his high-bloodpressure medication and while there was able to bring the problem to the attention of Deputy Superintendant, Delea. The reports were subsequently nullified! Just before leaving for court, the same officer approached Petitioner's cell, (411), and in a loud voice, called him a snitch in the presence of those same gang members housed directly across from him. Although the officer called Petitioner a snitch for addressing the wrongfull issuance of a disciplinary report to the Deputy, that officer was purposely enraging those gang members to focus their attention towards the Petitioner, as they did. Petitioner was not known to those gang members and had only been there for one month, hearing an officer call him a snitch would more than account for their belief that he was one. In so doing he involved himself in the attack and in fact was the cause of it, because he knew what he was doing when he purposely returned to Petitioner's cell for no official reason. Snitching is not tolerated by gang members.

Petitioner attended court and was sentenced to six months on his guilty plea, on that day, 4/22/10. Unlike all other prisoners who were sentenced and immediately removed from the general population and particularly from that housing unit, the Petitioner was returned to the unit in

protest. after voicing his objection, in violation of their own jail policy and/or practice. to unknowingly await the unprovoked attack. (see. attached (W.C.S.O.) orientation rules, p. 6,9,10,13,14,and 15). More than (72) hours later, on Sunday, April 26th, 2010, at apporximately 12:30/pm, Petitioner was assaulted inside of his cell where he nearly lost his eye and could have lost his life. due to the fact that the perpetrator was arm-ed with a dangerous weapon. which he had tucked in his waistline.

It should be noted: that all prisoners had been locked inside of their cells and that the attack took place as soon as security opened the cell doors. That at the time of the attack there was no officer stationed on the unit. Normally an officer would always be present on the unit when the cell doors were being opened. The officer stationed inside of the bubble is able to fully observe all movements outside of the cell on the vedio screen or by just looking down the tier. The vedio taped recording of the incident clearly shows that security was conspiciously nowhere to be found.

Petitioner remained in his cell for more than (24) hours, and (4) seperate shifts before security finally opened his cell and took him to the infirmary. During the dozen times or so that security conducted their rounds and counts, not one officer took notice of the Petitioner's severely injured eye. It was at approximately 1:00/pm, on 4/26/10, that C.O. Larry came to Petitioner's cell without notice and escorted him to the infirmary where he was simply seen by a nurse, given ice and an eye patch then denied his request to be seen by a doctor and to have his eye x-rayed.

Petitioner was then taken to the Lt station and shown the vedio taped recording of the incident and afterwords he was removed to the A-block housing unit, where he remained for approximately (5) hours before being returned to New York.

On Wednesday, 5/19/10, Deputy Superintendant Gallant, from the Worcester County Sheriff's Office, traveled to New York. to the Great Meadow Correctional Facility to meet with the Petitioner and conducted a taped recorded interview for approximately (55) minutes. During that interview Deputy Gallant informed Petitioner that the transport papers for the U.S. Marshals Service to return him to New York had been approved and signed by the Worcester County, istrict Attorney. on Friday, 4/23/10. It was at that time that he also made known to Petitioner that he had not been returned to New York by the U S Marshal. but by the Worcester County Sheriff's Office. Upon further investigation Petitioner has learned that it was also the Worcester County Sheriff's Office who transported him across state lines

from New York to Massachusetts, on March 15th, 2010. A matter that is in direct violation of the (IAD) agreement in that Petitioner was not allowed to exhaust his challenge to extradition and was already in the Appelate Court, also had a Habeas Corpus petition filed with the same Washington County Court that conspired with the sending and demanding instutions to illegally remove the Petitioner from the state of New York. Neither Governor of either state signed any document giving the County of Worcester the authority to transport the Petitioner across state lines and it should also be noted that the Petitioner never signed any waiver and was never even consulted or informed of the fact that he was being transported by the Worcester County Sheriff's Office, he had continually been led to believe that he was being transported by the U.S. Marshals Service.

Such action was undertaken in a permeditated manner to deprive Petitioner of his 14th Amendment right to Due Process of the Law and is simply being raised in this complaint to provide all interested parties with an overview of the callous disreguard that was displayed by those only interested in bringing Petitioner to the state of Massachusetts, wherein they placed him in eminent danger by failing to take the necessary steps to ensure his safety.

During the interview Petitioner also asked to be informed of the name of the individual who authorized his return to the C-Max unit after he had already been sentenced. Mr. Gallant's response was that the decision was made by the classification department. Again, Petitioner asked for the name of the individual and Mr. Gallant could not or would not provide the name.

Petitioner further alleges that his placement into the general population, where it was easier for him to be assaulted by the jails gang members, where his jailers knew or should have known that placing him in such less restrictive area would pose a substantial risk of serious harm, demonstrates their "Subjective Recklessness" and establishes that they acted with "Deliberate Indifference". Under the (IAD) agreement Worcester County owed an enhanced duty to protect Petitioner from any substantial risk of serious harm. They failed in that duty to protect!

Furthermore; the Worcester County Correctional Officials were more than negligent in failing to provide supervision and control. That failure resulted in the Petitioner being seriously harmed. As stated above, the Petitioner represented himself Pro Se on the criminal matter he was brought

to Massachusetts for and requested to be transfered to another facility because the conditions at the facility were such that he was not able to obtain meaningful legal services or able to attend a designated place of quiet where he could prepare his legal work. He also recognized that the jail was simply designed to warehouse prisoners and that the administration and security merely ran their facility like a day care center. Prisoners were allowed to be loud and unrulely, and allowed to yell and scream all night without any direction or correction from security. Security sanctioned and oversaw that their token inmates were able to substitute regular trays for diet trays, taking food right off of diet trays prepared for prisoners with medical issues. Petitioner was on a low-sodium diet and was being feed a lot of chicken (boiled) which was being taken off of the tray and substituted by a regular tray, so he complained a number of times. Then there was the issue of security failing to perform any meaningful security shakedowns designed to detect and confiscate any weapons. Even the razors that were despensed to prisoners are not required to be returned. It is common knowledge that Spanish speaking prisoners are notorious for carrying weapons and with the Worcester County's jail population being more than 60% spanish, it is incomprehensible that security would not take preventive steps to keep the jail safe. Security simply depends on the vedio system to detect incidences after the fact. The Worcester County jail is a dangerous environment for black prisoners and New Yorkers, as well as the minority population. County officials know that but yet still failed to protect the Petitioner.

    The County Jail has no law library and only (3) typewriters are alloted for the C-Max unit, which houses over (70) inmates. Petitioner waited for over (2) weeks to obtain a typewriter, then had to prepare his legal work in the day-room under conditions that were more than stressful. He had to deal with the television blasting, prisoners slambing dominos on the dayroom tables, all of the yelling and the shaking of tables, because there were no electrical outlets inside of the cells. Correctional officers and prisoners alkie took notice of the Petitioner's different demeanor and impressions were formed. Petitioner's request to be transfered was denied based on the fact that he was an (IAD) prisoner. (see.exhibit A). Upon Petitioner's return from court as a sentenced prisoner on 4/22/10, after waiting in the bullpen for approximately 1 1/2 hours to be transfered to the Degman housing unit for sentenced prisoners, a more restrictive hous-

ing unit employing (21) hour a day lock-down, (a safer housing unit), Petitioner's transfer to the Degman unit was also denied, in protest, because he was an (IAD) prisoner.

    Petitioner was brought to Massachusetts on a 1989 bench warrant and during the course of the proceedings learned that the victim was deceased, not ever having had filed a formal complaint. Basically, the People had no case! Aparently Petitioner had been brought to the state of Massachusetts and placed in an environment where his keepers expected he would be harmed. However; Petitioner's acceptance of a guilty plea was based in part on his desire to remove himself from the unit and the jail, as the conditions were unsuitable as mentioned above. Every attempt to be removed from that unit was denied based on the fact that he was an (IAD) prisoner.

    The delay in returning the Petitioner to the state of New York until after he was attacked only further points to official involvement in the attack, leaving a genuine issue of material fact in dispute. The Petitioner is a (51) year old prisoner having spent more than (15) years of his life as an incarcerated prisoner, never having been assaulted, due to remaining to himself and minding his own buisness. Within arriving at the Worcester County Jail, it took only (41) days for him to be brutally attacked, nearly loosing his right eye and nearly loosing his life, all because the Defendants failed to take reasonable steps and measures to ensure his safety. It should be noted that the Petitioner had no involvement or any problems with his attackers.

    To date Petitioner suffers a sunken right eyeball, sees blurred and double vision out of the injured eye. When looking to the far right the eye becomes misaligned with the left eye, on a regular basis white light flashes up and down the lower right eyelid and he has yet to be seen by an eye doctor. He is now suffering from emotional and psychological concerns for his eye and his future. He believes that he has suffered trauma to the brain and seeks serious medical treatment to determine the extent of his injuries. He is not recieving the neccessary type of treatment required for an injury serious such as this. He has only recieved an x-ray and eye drops "Tobradex". The eye still causes pain and Petitioner can still feel the strain on the muscle attachments to the eye. A grievance has been filed here at the Great Meadow Correctional Facility.

In antisipation of any submission on behalf of the Defendants for Summary Judgment, seeking Qualified Immunity, pursuant to Fed. R. Civ. P. rule 12 (b), Petitioner alleges that the Defendants had knowledge of his background, that he was a black, non-violent, (IAD) prisoner from New York. They further were subjectively aware of the general dangers associated with their jailhouse gang members, based on their personal knowledge of past incidences involving attacks upon other prisoners. Even in the face of all the dangers associated with the jail they violated their own rules and policy of not housing sentenced prisoners with general population detainees, by placing the Petitioner back into that housing unit after security had purposely labeled him a snitch.

Defendants had a heightened responsibility to protect Petitioner from serious harm under the (IAD) agreement on detainers, yet they failed miserably by failing to take reasonable steps to ensure his safety, even after he became a sentenced prisoner of the state of Massachusetts and was simply awaiting transfer back to the state of New York. <u>Placing the Petitioner back into the C-Max housing unit placed him in eminent danger and resulted in Petitioner being seriously harmed</u>.

As stated above, no sentenced prisoner is ever returned to that unit or anywhere in the general population where detainees are housed. The facts laid out in this complaint clearly show that the jail's officials violated their own policy and knew of the dangers that the gangs posed to blacks and New Yorkers. The conditions of the jail being such that there was no real assessment of the classification needs for the Petitioner's safety as an out-of-state prisoner from New York was the direct cause of his injuries and satisfies the subjective aspect of the Eighth Amendment, clearly pointing out the Defendants state of mind, exposing their indifference to the risk of serious harm.

I. **PARTIES TO THE COMPLAINT:**

**PETITIONER**
WAYNE THOMPSON #06A4609
GREAT MEADOW CORRECTIONAL FACILITY
BOX 51
COMSTOCK, NEW YORK 12821

**DEFENDANTS**

Worcester County
City Hall
225 Main street
Worcester, Ma. 01608

Sheriff Goulds
Worcester County Sheriff's Office
5 Paul X. Tivnan Drive
West Boylston, Ma. 01583

Supt. Hall
Worcester County Sheriff's Office
5 Paul X. Tivnan Drive
West Boylston, Ma. 01583

Corr. Officer (John Doe)
Worcester County Sheriff's Office
5 Paul X. Tivnan Drive
West Boylston, Ma. 01583

Class. Director, Michael Landgren
Worcester County Sheriff's Office
5 Paul X. Tivnan Drive
West Boylston, Ma. 01583

Medical Provider
Worcester County Sheriff's Office
5 Paul X. Tivnan Drive
West Boylston, Ma. 01583

District Attorney, J.D. Early Jr.
Worcester County
225 Main Street, G-301
Worcester, Ma. 01608

II. STATEMENT OF THE CLAIM:

A) The events giving rise to this claim occured over a period of time from March 15th, 2010, to May 26th, 2010.

B) Petitioner suffered a physical assault at the hands of a jailed gang member, set in motion by security staff, as a means of reprisal for filing grievances, complaints and bringing a matter of employee abuse of the Petitioner to the attention of the Deputy Superintendant, Delea.

C) Petitioner was a sentenced (IAD) prisoner being housed in the Worcester County Jail's C-Max general population housing unit, in violation of the jail's rules, policy, practice and/or procedure.

D) The 11-7 shift correctional officer, (John Doe), purposefully incited Spanish gang members to assault Petitioner by labeling him a snitch, before Petitioner attended court, on the morning of April 22nd 2010.

E) Security maintained hostile jail conditions by providing preferential treatment for Spanish gang members, in exchange for commissary donations, which led directly to Petitioner being assaulted.

F) After Petitioner suffered the serious eye injury it took security more than (24) hours before they were able to detect that he had been assaulted, even with the instilation of state-of-the-art survielance vedio monotoring

G) An example of the manner in which Spanish gang members were allowed to control and intimidate other prisoners, they would regularily have security move prisoners out of their cells and have other gang members move in so that they could cluster around each other and incite each other to comit violations against other prisoners

H) Upon being taken to the infirmary Petitioner was simply given ice and an eye-patch, then denied his request to be seen by a doctor and to have an x-ray.

I) On April 22nd, 2010, the Worcester County Court, sentencing judge ordered the District Attorney to notify the U.S. Marshall Service to return the Petitioner to New York.

J) The District Attorney approved and signed the transport papers for the U.S. Marshall Service to return the Petitioner to New York on April 23rd, 2010.

III     THE FACTS:

Petitioner was extradited from the state of New York on an (IAD) interstate agreement on detainers to the Worcester County Sheriff's Office to answer to a 1989 bench warrant, on March 15th, 2010. He was placed in the jail's C-Max housing unit and kept there until he was sentenced on April 22nd, 2010.

On April 22nd, 2010, after being sentenced by the Worcester County Court and returned to the jail to await extridition back to the state of New York, he was returned to the C-Max housing unit in violation of their own jail policy of not housing sentenced prisoners with detainees.

On April 21st, 2010, the spanish gang members being housed on the unit began harrassing the correctional officer (John Doe) on the 11-7 shift, causing him to move to issue several disciplinary reports. Petitioner was named as one of the people set to recieve a disciplinary report and brought it to the attention of the Deputy Superintendant, who promptly saw to it that the reports were not issued before the Petitioner left for court. However; the officer that sort to issue the reports came back to the Petitioner's cell and purposely labeled him a snitch right after the reports were thrown out, in the hearing of all of the prisoners housed next to the Petitioner.

The Petitioner had not had any issues or problems with anyone and never saw or senced any danger, prior to being labeled a snitch by correctional officer (John Doe).

The fact that Petitioner was returned to the C-Max unit by the classification department, was then brought to the attention of the Petitioner by Deputy Superintendant, Gallant after his return to the state of New York.

It is also a fact that Petitioner did not recieve any meaningful medical treatment, only an eye patch and a bag of ice after (24) hours had already past since the time of the assault, and that he was also denied his request to be seen by a doctor.

The Worcester County Jail did show the Petitioner a portion of the vedio recorded incident and Deputy Gallant did obtain and record an interview with the Petitioner on Wednesday 5/19/10.

Petitioner sent (2) letters to Assistant Superintendant, Gallant dated 5/21/10 and 5/24/10, requesting amoung other things, the name of the classification officer responsible for placing him back into the C-Max unit and the name of the security officer who called him a snitch. He also requested a copy of the taped interview and the name of the officers who transported him back to New York. Those letters were turned over to their staff attorney and no information has been provided to Petitioner. (see. Exhibit - Luke Gallant's response).

## IV   INJURIES:

Petitioner has suffered a serious injury to his right eye that has resulted in a diminished ability to see as explained in the body of this complaint. He has suffered minor cuts and abrasions on his arm and chest as well as a life scar below the far right corner of the injured eye. He continues to experience pain in the eye along with recurring headaches and believes he has suffered some brain damage from the severe pounding.

## V   EXHAUSTION OF ADMINISTRATIVE REMIDIES:

Petitioner has exhausted his administrative remidies by filing his grievance in accordance with the policies of the Worcester County Sheriff's Office. However; this claim seeks monitary relief for which the grievance policy cannot provide, as such, exhaustion of administrative remidies is not a requirement for this § 1983 complaint. (see. Civil Rights of Institutionalized Persons Act 7(a), see also attached grievance and grievance response).

## VI   RELIEF SORT:

Petitioner is suing the Defendants in their individual and official capacities, for punitive damages in the amount of 11,750,000.00, compensatory damages in the amount of 7,500,000.00, actual damages in the amount of 5,250,000.00, and seeks double damages for the intentional violation of their own rules and regulations pertaining to housing sentenced prisoners seperately from detainees.

## VII  PREVIOUS LAWSUITS:

Petitioner has filed no other lawsuits in State or Federal Court pertaining to the same facts involved in this action.

Petitioner, asks that this court appoint counsel to conduct research, obtain records and documents and submit a supplemental brief, in the interest of judicial economy and in light of the fact that he is an incarcerated person being housed and held out-of-state in the state of New York.

DATED 6/24/10

SIGNED *Wayne Thompson*
WAYNE THOMPSON/#06A4609
GREAT MEADOW CORR. FACILITY
BOX 51
COMSTOCK, NEW YORK 12821

SWORN TO BEFORE ME THIS
24th DAY OF JUNE, 2010.

*Curtis P. Poirier*

CURTIS F. POIRIER
Notary Public, State of New York
No. 01PO6122732
Qualified in Warren County
Commission Expires February 22, 2013